The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw a nod and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, Integrated Direct Marketing v. May. Mr. Lee. Good morning. Good morning. May it please the Court, my name is Charlie Lee and I am Appellate Counsel for Integrated Direct Marketing, whom I'll refer to as IDM. I'd like to save four minutes for rebuttal. Judge Rankin might retain jurisdiction over one count of conversion against Mr. May, so regardless of the outcome here, we will be back before the District Court. We're asking the Court of Appeals to reverse summary judgment in favor of Merkle and Mr. May, remand the case for complete discovery and for a full trial on the merits. The success of IDM's de novo appeal involves three primary issues. The first being, was there a misappropriation of IDM data? I believe that issue is uncontested. The second issue is, was there sufficient direct or circumstantial evidence of a misappropriated trade secret? And if there was not sufficient direct or circumstantial evidence, was the misappropriation or the intentional disruption of documents enough to warrant an adverse inference of The applicable law in this circuit, as well as in the Sixth Circuit, Arkansas, and in North Carolina's Fourth Circuit, we maintain that we can maintain and establish a claim of theft through purely circumstantial evidence. Whether a trade secret exists is a fact-intensive question to be resolved at trial, and the Fourth Circuit has ruled on that. If there is a lack of direct evidence that was caused by Mr. May's instruction... Yeah, but it's subject to summary judgment, too, though. It may be fact-intensive, and if you prove the trial was still subject to summary judgment, of course. It is, Your Honor. I would concede that point, but also... You don't think it's appropriate here. Yes. And all of the facts we contend were resolved in favor of the moving party, as opposed to the non-moving party. The defendant put forward evidence in response to your motion for summary judgment, and then it's your duty to come back and say, to rebut that with your own evidence. So, even for summary judgment purposes, it was perfectly appropriate for the defendant to come back and say, this is what we have to show in response to your summary judgment motion, and then it's your turn to come back against that. We're still even at the summary judgment stage. That's correct, Your Honor. The burden falls back on us to raise disputed issues of fact. The problem that we had at the district court was that we believed that the district court weighed credibility issues in favor of the defendants, and that is an issue of fact that we believe should go to trial. How specifically did it do so? Well, it relied on affidavits from Merkle employees stating that they didn't use the information. They relied on the affidavits of their experts with respect to the destruction of documents. We brought forth key evidence, the direct evidence of intent from Mr. May through a text message that he was going to hurt IBM. I'm not going to use the vulgarity that he used in his text message, but that is from Mr. May, which shows motive. Mr. May admitted that he downloaded everything. This is not a case where you have the native laptop. But you're entitled to reasonable inferences to say I want to hurt them. The reasonable inference is I'm going to appropriate trade secrets and use them somewhere else. Yes, but we have much more than that, Your Honor. I mean, that's just the intent of Mr. May to hurt IBM, and he admitted that he downloaded everything. There was an interview that he had with Merkle shortly after he was terminated by IBM with Merkle where he called another employee of IBM asking for Google statements of work. The timing of Mr. May's hiring by Merkle and the immediate assignment to Google and Dell accounts, which are shared clients of IBM and Merkle. There are internal e-mails implicating Merkle soliciting Mr. May of IBM's proprietary pricing and process information. But didn't the record also show that that information was not provided because of concerns about its proprietary nature? I'm not quite understanding your question, Your Honor. You told us about e-mails, and I'm asking, you talked about the solicitation, the request, and I'm asking about the response to the request. Yes, so the response to the request was not provided, but I think under... So what the inference... So Merkle solicited, asked for this information from May. May doesn't give it to him. That's exactly the point I'm making, is that it wouldn't be, I don't think it's reasonable that May would put that in writing as to what the information he would have. I think when you take the totality of the evidence, that he downloaded everything, he copied everything. He didn't and didn't provide it, and didn't provide... The inferences, the inference that you're asking us to draw is actually, it seems to me, arguably less strong than the inference that that was consistent with not providing information, that there was a concern about its proprietary nature. Yes, so when you look at the totality of this, what did he download? And if you look at the joint appendix number, I think 709 and 710, this is the expert report. Now, this is getting to a spoliation issue, but I think when the documents on his external hard drive were deleted, he left some metadata, and what metadata is, it provides information about other data, about the documents that he created, documents that he accessed, documents he copied, when he deleted them. And if you look at the file names, I mean, it shows budgets, it shows sales plans, it shows proprietary business information that Mr. May copied onto his hard drive. So when he goes to work for Merkle, four days later, he questions whether or not Merkle's price per lead of $148 to Google was high. And then as a result of that, you get an email from the sales executive, from Merkle, asking Mr. May what pricing information worked specifically at IDM and what didn't work. So Mr. May possessed that information. Now, he may not have responded in an email, but there's further evidence. Is this with respect to the Google bid? That's with respect to the Google bid. Did they submit a Google Brazil bid? IDM? Yes. No. IDM, no, because after that $148 price per lead was stated to Mr. May, and they solicited what worked at IDM, that price reduced to $140.50. As a result of that, Google stopped talking to IDM, so IDM didn't submit a Google price. So that came two days later. Wasn't that IDM price the price that IDM used throughout North America? No. That's what your fellow said in deposition. The $142 price, the way these bids are made, some companies will submit price on a price per lead. Other companies will do it on a total cost. Now, at deposition, Mr. Slater was asked, how did you come up with the price per lead? He testified that he doesn't submit bids based on price per lead, but if he had to do it, that he would do it by simple mathematics, which would be taking the total price, and you divide that by the number of leads, and that's how you get to the price per lead. So in his affidavit, in response to summary judgment, he came up with a $142 bid. I thought he was asked many times in deposition what the amount was, and many times refused to do it. I've been in depositions like this, and I really, you know, there's one thing he should have been prepared for in deposition is to come up with a figure. Right. So maybe you can tell me where it is in the JA that he says it's $142, and that that was the figure that they were using then. It's only in his affidavit in response to summary judgment. Right. So we don't consider affidavits that are in tension with previous deposition testimony. Only if the questions in deposition are in direct context with what he clarified in his affidavit. All right. They were asking him. Fair enough. So it's up to us to decide whether they're in conflict or not. That's correct. Well, I would go on to another point, unless my colleagues have any problem with that. I think that you are, I think that that's really not your strongest argument here. I'd be interested in the spoliation argument. That's where I was going to go to. Great. So even if there wasn't direct or enough direct or circumstantial evidence, So district court's decision navigates through selected testimony and affidavits, again, to the detriment of IDM. Why don't we go straight to the spoliation argument? Okay. So Judge Brinkman, on footnote 35 of her decision, she finds that all data was restored, and that simply is not accurate. Okay. So what data wasn't restored? Okay. So the only data that was restored, there were four deletions, one that occurred on July 16th, another that occurred on September 7th, September 19th, and September 22nd. The September 19th and 22nd deletions contained only 49 files. Those were deleted, put into the recycle bin, and that was easily restored. Any of us can do that and just go back into the recycle bin. I wouldn't be too sure about that, but go right ahead. Okay. But thank you for the comment. But she makes no mention of the July 7th deletion. There were 50,000 emails with 22,000 attachments that were deleted. She makes no mention. And you never recovered any of that. Well, that's what I would respectfully ask the court to inquire of my colleagues on either side. Where are the physical documents from the July 16th and September 7th deletions? Where are they? They simply were not restored. Their expert, I mean, uses words very carefully. It is my opinion that some of them, not all of them, okay, because they admit that some just don't exist. It is my opinion that they are restorable. But no one has restored them. Are you going to lay in basis for your spoliation argument? No, the basis for the spoliation argument. That constitutes spoliation. Yeah, that constitutes spoliation. The destruction of those documents. Was there no way for you to figure out from your files what those files would contain? That's an excellent question. I wondered that myself. Why didn't, you know, what was in our files that we can say were constituted trade secrets? That's why we got our expert to go in there and look at, see what metadata you could find. Because some metadata is destroyed. Yes, yes, yes, and the answer to the question is what? So, again, if you look at page 709. You could just tell us the answer. Okay, so IDM business development tracker, IDM pipeline concept, IDM pipeline report, IDM sales plan, IDM 2014 client budget, IDM budget forecast, Dell data file match groups, retail product plan. It would help me when I said spoliation argument. Just the fact that information is missing does not do what you want it to do, because you want an inference created for you, correct? And so I'm interested in your argument. You don't have, just tell me what your theory is of why data is missing and that data's absence should allow an inference of what? That would help me. The inference that I want the Court of Appeals to draw is that Merkle used the information that May had to receive economic value in their bids for Google and for Dell. And I believe the totality of the evidence, including what I would consider the silver bullet here of Merkle on May 9th, asking Mr. May of what pricing information that he had with respect to IDM's pricing and their bid going from 148 to 140.5 after that email. I want the Court of Appeals to draw that inference, that they used that information. Did you argue Dell on appeal, the Dell bid? I thought you just argued the Alteryx and Google. Yeah, it's primarily the Google bid, but we did argue the Dell information with respect to Alteryx and the process that Mr. May called Mr. Wiedauer and they had a telephonic conference with Mr. May, Mr. Wiedauer, and Merkle executives about match stringing, a process that Mr. Wiedauer developed while he was at IDM. That's just part of the evidence creating what I would consider the circumstantial evidence, which we believe that we're entitled to prove our case. But what does that show you about May? He placed a phone call to Wiedauer, your employee who agreed to talk? And they had a meeting. By the way, how is that any wrongdoing on the part of May? That meeting or that phone call, let's start with the phone call, how is that any wrongdoing? Because Merkle and May were on notice on May 7th when our counsel sent a letter to Merkle saying that Mr. May... That you can't call anybody at our operation because they might talk to you? Well, because there was a confidentiality provision that we're going to look at this matter very, very closely. They made a phone call to Mr. Wiedauer who worked for Mr. May while he was at IDM. Mr. Tobey, who is another sales executive, got on the conference call. So Wiedauer was smart enough to know that Mr. May is not his boss anymore? Well... And so Wiedauer was your employee, right? Wiedauer was our employee at that time. But it begs the question, Your Honor, why they would call a competitor who was under the same confidentiality provision to get information about IDM's processes. It begs the question. It leads to the question. It leads to the question. Point taken. But... So that part of your claim is a former employee called one of our current employees and our current employee... Well, if there's any fault at all, which I don't know if there is any, who's the fault in that telephone conversation? Well, it's the solicitation of that information. And the fact that Mr. Wiedauer provided that information, I agree that Mr. Wiedauer should not have done that. But they solicited that information and received that information. If that information was commercially available... Okay, were both parties deposed? Both parties were deposed. And both denied that there was any communication at all? So that gets to my weighing of the credibility, I think. Well, but if you don't have any evidence the other way, you know, it's what a reasonable jury, and if a reasonable jury doesn't have any evidence that confidentiality, confidential information was passed, how could they find in your favor? Because circumstantially you can lead to the fact that they reduced the price from $148 to $140. It's just the timeline of events and the circumstances surrounding what occurred. But you could also say that the sun came up the next morning. What ties it? There's nothing that... The problem that I'm having is that you've done a very good job of saying that information disappeared and the employee may have had information. But you're asking us to draw a tremendous number of inferences from the fact that he simply possessed this information. My time is up. May I continue? Yes, you can answer the question. He possessed the information. There was motive in his text messages. Merkel solicited the information. He was hired. They had meetings about IDM pricing. There were telephonic conferences dealing with alterics. The price per lead reductions from Google from $148 to $140.5 was followed by meetings between Mr. May and Merkel's general counsel about the documents that he had. You had deletions that occurred when there shouldn't have been deletions, which destroyed the direct evidence that I contend the Court of Appeals is asking me about. There was a false affidavit and testimony. And Judge Brinkema, I believe, weighed the credibility because all she had were affidavits and deposition testimony as well. And we believe at the summary judgment stage that the inferences should be drawn in our favor. And we're just asking for a trial on the merits. If we lose on the merits at trial, I'll have to accept that. But at the summary judgment stage. I'll bet you won't. Okay. I'll bet you won't. I have to ask you something. There was Mr. May obviously did things that were inappropriate. And as I understand it, there were discovery costs put against him. Is that correct? That's correct. And how much were they? I think the sanction that Judge Brinkema imposed was $60,000 for the destruction. I think it's $60,000. In that neighborhood. Okay. Thank you. Thank you. May it please the Court. I am Declan Leonard. I'm here today on behalf of the Applee Merkle, Inc. Mr. Leonard, if we credited the deposition testimony about the $142 price per lead, isn't that enough circumstantial evidence to preclude summary judgment? I don't believe so at all because his affidavit, where that's the first time the $142 came about, has to do with North America. There was a question asked of whether or not that was North America. His affidavit specifically says so. He actually did give a figure in his deposition as to Google Brazil. I know that. I had him do it. I put a calculator in front of him. Because we had a statement of work, it's in the record, unlike statements of work that we're talking about this $142. We had him do the calculation, and the price per lead for Google Brazil came out to be $11.20. So there is a calculation in the record. What do you mean? Rather than $142? That's absolutely correct, Your Honor. What we did was we took a statement of work for Google Brazil from IDM, and we asked Mr. Slater, the president, can you figure out what your price per lead is here based on this statement of work? And you take the total dollar amount and then divide it by the leads, and it came out to be $11.20. His explanation of that is, oh, but that was a lost lead or work that we were going to try to get the work. Do you remember that? But that is the only evidence, but there is a calculation in the record. So this $142, you know, Judge Branko looked at this and said, where does this even come from? There's no documents. There's no statement of work. There's thousands and thousands of documents in this case. They could have come up with a statement of work that showed somehow they were able to come up with this math. Instead, it was an 11th-hour self-serving affidavit. This was not a case that was light on discovery. So there was plenty, plenty of discovery throughout. Well, and this is also not a case where the person that supposedly took the trade secrets was blameless. That's right. I do not want to answer. I mean. I don't want to answer on behalf of May, and obviously his counsel will get a chance. But one thing to keep in mind throughout all of this is they have tried throughout this litigation to just lump the two parties together, and yet there's no evidence. Again, no stone unturned here, and nothing that shows that this information ended up at Merkle, let alone was ever used by Merkle. We're down to two specific instances. Don't you have the fact of one of your employees asked, which your colleague talked about in his argument, asked Mr. May about pricing in the earlier group?  Well, I believe we referenced it in response to Appellant's counsel. Is that what you're referring to, Your Honor? The pricing it integrated. Didn't one of your employees ask May about that? That's correct. An employee did say what, I'm paraphrasing here, I've got the email, but it's basically what can you tell us about the pricing approach that worked at IDM? The uncontroversial testimony here is that nobody ever responded to that. The person who actually did the bid for Google Brazil, her name is Candace Quill, said, I never talked to these people. I never considered it. I never considered anything that Mr. May gave. So the answer is, should they have asked that question? Probably not. But nobody ever responded. So there's no evidence, and believe me, this was the subject of. This person who supposedly received this email was deposed, right? That's correct. And flat out said he just, was it his usual habit not to respond to emails? So, in other words, this was a question that was posed to Mr. May. Sorry, do not require bonds from emails. Was that his testimony, that he just would send out emails asking questions and no one would give him an answer, but it was okay because he was used to that? Yeah, I don't remember exactly what he said. I mean, this was a group email. He testified at one point that he later called Donovan and told him that it was probably not a good idea, some words to that effect. That's correct. So there was a little bit of follow-up. That's correct, Your Honor. But did he testify that he said that in response to this? That's correct. In other words, yeah. And so there was some follow-up of not only was that information never provided, but probably not a good idea to do that. So I think they understood that. But, again, we're here on a misappropriation claim. That information did not come over. There's no evidence on the record that it influenced in any way this proposal, and they never even bid on it. Could I ask, IDM did not submit a bid for the Google Brazil project. That's correct. And I understood, counsel, to suggest that part of the reason might have been that IDM had access to valuable information that allowed, it gave, I'm sorry, that somehow they could get the jump on them because of the information that they had access to. At least that was my understanding. That there was a causal connection between not actually submitting a bid in the Brazil matter and the access to the proprietary information. I've seen that explanation, but the problem with that explanation is they wouldn't have even known about any of these internal communications at Merkle at the time. And so for that to have been the cause and effect I just think is just completely not supported by the record. For them not to have submitted a bid, they claim it's because Google stopped talking to them. Nobody from Google was deposed by IDM to support that proposition to say this is why we lost that work. As I understood it, part of their claim is that you knew the 148 number or whatever. Isn't that correct? The North American number. Isn't that their claim? That you underbid that? That may be their claim. Our number, yeah, that may be their claim. Where does that number come from? The 148. These are just internal discussions that a big company is having about how do we bid on it. I thought their claim was that they basically told you the 148 number so you could underbid it. It wouldn't have been the 148. It would have been, I guess their claim would have been, it would have been the 142. Okay, the 142. Yes. I thought that was the number that they used in North America. Is that not right? It absolutely is. Wait, wait, don't go anywhere. Don't go anywhere. I'm getting to the point. If they used that number 142 in North America, would other people know that was the number or not? I mean, would the people they dealt with know that was the number they were paying them? It's a great question. I can't answer that because I just don't know because I don't understand who. In other words, in order to show something's a trade secret, you have to obviously show that you protected this. They don't talk in the record. I know. I'm not disagreeing with you on that point.  Yes, Your Honor. This is what I just said. If they said that 142 is the number we use in North America, why wouldn't their customers know 142 was the number they used? They may very well. We didn't know that 142 was. No, but I'm saying if customers knew 142, then a lot of people knew 142. In other words, it's not protected information. This is a softball. I don't understand. The answer is yes. I appreciate that. Yes, Your Honor, yes. Well, it's only a softball if the answer gets where I think it goes, but maybe there's some answer that makes it an excellent slide. I understand, Your Honor. In other words, this is not protected information. People know this information. And the fact is, I guess it goes back to the causal connection. If the other side said we use 142 in North America, but ah-ha, he must have told them because they came in with a bid of 140.5, well, maybe your company did know 142, but I don't know how that inference becomes he gave it to them, if, in fact, off their own information, and I'm not sure this is a reasonable inference, but if that's the number they used for customers in North America, that would be Mexico, U.S., and Canada. If they had customers there, those customers might well talk to each other, other people. Can I follow up on that? Yeah, if that's true. And ask you, do you have to put the price per lead in your bid? Not necessarily. Because his whole deposition, this guy's whole deposition testimony was, we don't do it that way. We have this complicated. I can't give you a price. So in that way, it could be hidden from the customer? Well, whether it's hidden or not, I think it can be extrapolated out. So, for instance, when we looked at one of their statements of work, I think these statements of work are all over the board in terms of how they bid these. But the one in particular that we saw for Google Brazil in discovery is we were able to extrapolate. Now, they didn't put it in a line item. They didn't say, here's our price per lead. We took the total dollar amount divided by the total leads that were being requested on the statement of work, and that's where we got the $11.27. So that question is valid, but it would maybe require a little bit more work than just looking at the contract and seeing the figure. That's right. That's right. But, yeah. Really, my question was, wasn't it they said we charge $142, but if that, in fact, is what they charged, and a customer would know it, however a customer might know it, excellent extrapolation of the question by Judge Mons, but the point is, based on what they say, it seems to me a lot of people might know what their bid number was. Or at least to the extent that you could reverse engineer it, which I understand is what you're talking about from the statement of work, then anybody could reverse engineer it. That's correct. Anybody that sees the statement of work, that's correct. So you were not charged with this $60,000 in costs? That's correct. Merkle was not assessed sanctions in this matter. Mr. Kinzel is going to talk to us about that. That's correct, and I see my time is up here. So the spoliation claim is not made against you at all? Well, so I think the spoliation claim was just trying to lump everybody together. I mean, they never specifically said Merkle destroyed anything. Merkle had access to any of this stuff. But, again, I think probably tactically, why just get one person on the hook when you can get the big company on the hook? Do you understand the spoliation claim to have been made against you? I believe that their motion does include spoliation against. Isn't it because the suggestion is that Merkle induced May to delete files? Yeah, and they've used the word, and induced is probably similar, but they've used the word influenced in some way. But there's no claim that you, separately from May, your people erased files. That's correct. I'm not aware of any claim against Merkle that they destroyed files. It's the inducement. All right. Thank you.  Good morning, Your Honors. Jim Kinsel, along with my colleague, Rebecca Brickensiegel, on behalf of Drew May. Your Honors, there's been a lot of talk about what was and what was not said over nine months of discovery and lots of affidavits, lots of disputes, including Chad Slater's internal disputes about what happened with the pricing. I want to go straight, if I could, to the Google Brazil. Chad Slater said in his deposition that nothing about Merkle's Google pricing proposal can be tied to anything May learned while at IBM. Yeah, that's fine. But they are allowed to look at your records to check to see if that's true, right? Well, the records wouldn't show anything, Your Honor. Your man says they don't, but often, I don't know, maybe you're a young man, maybe this has never happened to you, but sometimes your clients don't remember things, and lo and behold, it shows up in some document or in some phone call. That certainly happened to me when I was a lawyer. Did that ever happen to you? So that's why they're allowed to look at your records. And you would be right, depending on the timing of this, Your Honor, Mr. May was terminated in March 11, 2014. If you look at Mr. Slater's affidavit, the pricing that he's claiming was taken by Mr. May was in or around May of 2014. Mr. May was already terminated. He was gone from IDM at that time. Yeah, but the suggestion is that he got it from somebody who was working for them then. That's his whole claim. That's on Alteryx, Your Honor. That's on Brian Wiedauer. When it talks about Google Brazil, the IDM – He knows what their pricing is, and he takes that information with him. It doesn't matter that he's already been terminated. No, Your Honor, if I could disagree with that, please, because the pricing per lead is different every single bit. Through all the statements of work, all the documents that have gone back and forth, everything in IDM's control, not one single document, not a document has come about in discovery, put before this court, put before the district court, showing that the pricing per lead is what they claim it to be. The only thing they have put forth is an affidavit by Chad Slater. No, I understand that, but they say there's some documents missing. So why don't you talk about those, because that's where the spoliation claim comes. The only documents that are missing are the documents that show that the price per lead is not what they say it is. How do you know that? Because they're in control of – there's no allegation here that Mr. May destroyed original copies of statements of work. Mr. May wasn't even involved with – there's nothing in that document. Are you saying that IDM has all the information that they say they need to derive what they would be looking for in the files? Absolutely, Judge Duncan. I'm sorry. What was the verb? Pass? I said absolutely. No, I know what you said, but what was the question? That's not a verb. Is it? Right, I understand. Thank you. Did they pass? Is that what you said? Had. Had. Right. Okay, so tell me about that. Right. So when they talk about what was destroyed, what they're focused on is emails, Drew May's emails from a file container before we believe that there was even a duty to preserve. But if you look at what's deleted, what they claim is to be deleted and can't be recovered are IDM's own emails. Their expert, IDM's expert said, I asked to see whether there are other sources of information, whether there are sources of documents, native files, something that Drew May worked on while he was at IDM so I can investigate any other claims. IDM didn't even show their own expert what was at issue. And so when we talk – I just want to get this straight. You're saying that there is no indication that any file has been deleted other than files that the company has. Is that what you're saying? In other words, things were deleted, right? Things were deleted. Lots of things were deleted. Right. There are four sets of deletions. It's either things were deleted or not. Were things deleted? Yes, Your Honor. Okay. Were those things deleted? Is it your claim he deleted what was a copy of a document they had and still have? Is that what your claim is? No, not every document that he may have deleted because, remember, the only reason I thought about your question a little bit is he deleted – there's the deletions and there's the destruction. So not everything that was deleted was destroyed. So he pushed delete. Most of those files, the overwhelming number of files, have been recovered with or metadata. What they're claiming has not been recovered, is my understanding, are the emails that were deleted in an email-contained file. But then you substitute. That's the fine distinction and a good one. So everything that was destroyed, there's a copy of in the possession of the other company? They should have a copy of – IDM. IDM should have a copy of all of IDM's emails. And if they didn't preserve their own emails in this case – Those are the only things that were destroyed. My understanding is what was destroyed, their claim is – and, of course, it's a big record, so I hope I'm not misstating this. We'll find out. Right. My understanding is what they are claiming is to be unrecoverable is an email file container, which has got that 50,000 number that was thrown out. Those are emails and attachments to emails. You made this argument to the district court exactly this way. I believe so, Your Honor. Again, I don't want to misstate it. Did you say you believe so? We've talked a number of times, and the concentration of certain documents being unrecoverable, most of that – again, it's a big record, so I hope I don't misstate it. This is a pretty significant – this is a remarkably, it seems to me, significant issue. Right. I think I'd want to know that. Right. Can you explain – IDM had an expert as well. Correct. Looking at the metadata. Correct. So you're representing to us now that all we're talking about – and I'll ask counsel for IDM this as well – all we're talking about is that evidence, not the deleted, but the destroyed. Well, they have flagged all four of these deletions. They have talked about there was four instances of deletions. Well, the deletions you told us don't matter because they can be recovered through the metadata. Right. So it's the destroyed – the only ones we're concerned about are those that are destroyed. And they come from July 16th and September 7th. Is that right? I believe it's the ones that are in the July ones where the e-mail container file that had all the e-mails in there are the ones that they're concentrating on about what was deleted and not recovered. And those are the ones that are – should be with IDM. And, Your Honors, this is – these are – Could I just – Sorry, go ahead. Could I just ask one more question? When is the – when is it – when is IDM arguing, as of when, that there was a duty to preserve? They are arguing almost from the jump. No, I don't understand jump as a calendar term. Their view, as I understand it, is that Drew May knew he had files on hard drive, knew that he should be in violation on his hard drive. I need a date. I need a date. As of when? My understanding is they think that the first letter that they got – when I say they, I think Merkle got a letter and Drew May got a letter from IDM's counsel soon after he was – May 7th. May 7th. So as of May 7th. Right. Okay. So I'm sorry to harp on this, but to me this is crucial. And I'm still – you always put in the little fudge word. So I just want to be sure that I understand. You have the documents that were deleted but retrieved, right? That's one category of documents. Yes, Your Honor. And then we have documents that were deleted and they say could not be retrieved. Correct, Your Honor. And they had an expert who said that, right? Right. I don't think there's any question about that there were certain documents, and that's that email container file, that were deleted and can't be retrieved. Yes. Could not be retrieved. Okay. So what is your argument about deleting those was not – was not – was not spoliation? Yes, Your Honor. A couple points about that. Number one, for the factual finding on this, this is the clear error, and Judge Brinkema made the findings on the facts about the duty to preserve and that there was no spoliation. Okay. Absent clear error, there cannot be a reversal. It's a fact – it's a law question. So give me another argument. Right. And when we're talking about – if you look at all the letters that were sent from IDM to May, those say, remind you of your obligation to conform to the confidentiality agreement. And what they've talked about and what their expert talked about is the way to get rid of these documents that they claim is a violation for Drew May to have is they're residing on Drew May's hard drive, the one he owned, and – You're explaining why they're destroyed. Yes, Your Honor. Okay. That's right. I don't think that was exactly the question. That's not the question. The question is, okay, they're destroyed. Do they have information that is not retrievable, as the other side says? Maybe that's the best way of putting it. Well, our position regarding that, Your Honor, is that all those emails are retrievable off of IDM's own server. And that is so because they're a party to all of those emails? Is that what you're saying? The emails are going through the servers at IDM. So if it's an internal IDM document or it's an IDM email going to Google, going to any of IDM's clients, those emails are going through IDM's own servers. They reside on their information. And when you talk about these – Is that because any document that they would have an interest in would be a document that would go through their server, so it would just have to be something they could, should, or would have a copy of? Yes, Your Honor. That's exactly right. To our inquiry. And why is that? Because I would have thought they would be interested in emails that your client was sending around. I don't think there's – on his own personal email? Yeah. Because keep in mind that they have looked at and they captured Drew May's individually owned computer. So what your answer is, they've got all those? They should have all those, yes. One more question. Talk to me about how sanctions fits in here, because obviously the district court was concerned. That's right, Your Honor. The district court was concerned. How does the district court's basis for sanctions inform our analysis of the spoliation issue, if at all? Well, the sanctions was on his affidavit, Your Honor. And that was the – I did not keep – You mean the fact that he lied to the court? Well, Your Honor, we have a different view, but that was for finding that was a false statement, yes. Thank you. So she didn't impose sanctions because she credited the argument that is being made here by your colleagues on the other side. Is that correct? Yes, on paper, Your Honor. Whether she was influenced by that is a different question. But it was – because it was – it was all kind of lumped together about the keep, but I did not keep, and the destruction that was tied together. And there's no appeal of the sanctions award? Not as of yet, Your Honor. Not as of yet? Because the conversion count, remember, still resides in the district court, so there's not a final judgment on some of these points for us to – Well, for our purposes. Correct. It's not before us. Right. And keep in – bear in mind with the spoilation, there is the clear error standard for the findings of fact. I understand the abuse of discretion standard for the application of the law to the facts, but Judge Brinkema has already weighed in on this, and keep in mind also, if it pleases the court, that Judge Brinkema had a whole evidentiary hearing on her own, asked Mr. May or ordered Mr. May to fly from Arkansas to her courtroom, and she examined Mr. May under oath about all of these points, both on the affidavit – actually, she didn't, I don't think, ask a question about the affidavit, but about the potential spoilation of evidence, examined him right there and was able to look at his demeanor, was able to hear the tone of his voice, was able to look him in the eye, and made all of these determinations. And as she pointed out, that seeing a cold record is one thing, and she wanted to see Mr. May. And I understand this court's job, of course, is to look at cold record, but on that demeanor and on those factual findings on spoilation, she has weighed in on it, she has made her determinations, and I respectfully submit to the court that those determinations are supportable and don't rise – even if the court were to look at it differently, don't rise to the level to be clearly erroneous or abuse of discretion on that. Thank you very much. Your time is well expired. Thank you very much. I want to focus on Judge Brinkman's opinion and the basis upon which she relied. Before you do that, and I am interested in that, can you tell me that these documents – whereas in the record is there suggestion that these documents are anything other than documents that you possessed? The ones that could not be retrieved? That's the problem, is that we don't know what documents were destroyed. He copied everything and destroyed – He copied a document that you had. From something. Then you had to have had it. Well, I agree with that, but these could be documents that he created in their expert report. Can't you tell from the metadata where they come from? No, because some of the metadata was destroyed as well. So when metadata is destroyed, you have no information about the other document. But can't you match them up? I mean, even if you're as unsophisticated as I am, you have what he gives you, and you have your own files for the same period. Well, they didn't give us anything because those documents were destroyed. But you ultimately – Now, I understand what Your Honor is saying. That's the problem with that case. What was the list you were reading from, from the record? I was reading from our expert's report where he was able to find some metadata from the September 7th deletions. Okay. Okay. Now, I want to make a distinction between metadata and the actual documents. I understand, but it gets you to the actual document that's in your file, metadata does, doesn't it? Their expert's report, if you read their expert's report, it says on the July 16th deletion, there were 100,000 emails, 22,000 attachments, and other information. I don't know what that other information is. The July 16th deletions are gone. That's why I asked the court to ask them, where are they? I mean, if you can restore it, then restore it and give it to us, and that would – Well, I think the question, since you are before us, is why can't you determine some of that from your records? We did. And those are the documents that we were able to retrieve the metadata. But you retrieved the metadata from his files. The metadata from his hard copy. Yes, that's what I'm saying. Right. So the question is, what have you done to attempt to match whatever files he may have copied? What have you looked for on your servers during the relevant period? I don't know. That would have provided some guidance that enables us to draw an adverse inference from the fact that some of these were destroyed. That's a good question, Your Honor. Is the answer that you don't know? I don't know. I don't know what we did. We just had to file next. Excuse me. Sorry. Is your answer A, that it wasn't done, or B, you don't know whether it was done? It's B. I don't know whether that was done. What I do know is what's in the record and what's in the expert reports as to what metadata was left from the September 7th deletions contain file names which are of the proprietary nature of budgets. Is this the first time you've heard Mr. Kinzel or whoever the lawyer for Mr. May might be say they had everything they claim they can't get from us, they had it? Yes. You've not heard that before? No. His core argument is that they didn't have a duty to preserve. I understand that's his core argument, but I read from the briefs that he was also making this argument. You didn't read that in the brief? No. It's his argument that we have everything. I mean, we have some of the stuff. Yes, sure, we have e-mails, but we don't know what he created. We don't know what he attached. We don't know what the other information is. Hold on for a second. Is your claim then that you really don't know, or is your claim that you don't know because you haven't searched closely enough your own files, or is your claim, I think I hear you trying to make a claim, that he might have created other documents relating to our business that we would not have captured? Yes, we simply don't. Is that your argument? Yes, well, that's part of my argument because we simply don't know what he took because he downloaded, quote, everything and deleted it. He downloaded it from a server. He downloaded it from his personal laptop, his IDM laptop. Some of it. No, he downloaded everything from his laptop. But where did it originate? It originated in his laptop. His office was in Arkansas. IDM's primary offices are located in Reston. So that's the difficulty of these theft cases. I mean, if you look at, I mean, what direct evidence do we have? You have documents and you have witnesses. The documents were destroyed, which is why we're asking for the adverse inference, and the witnesses are denying that they ever used that. So what we're left with is circumstantial evidence, and what we have is the text and the e-mails and the questions about proprietary information, the price reduction, and we believe that that is enough evidence to get by a summary judgment. According to counsel for IDM, if you could reverse engineer anything from the statement of work, it would be $11.27, and I'm sure you disagree, but point me to something in the record to support your $142-$148. No, don't. No, just record site. I don't have that record site other than the affidavit. The affidavit that appears in theó That's $142 without any explanation. It doesn't explain it and then goes on. I mean, you said repeatedly that you don't price on a price per lead basis. That's right. You said it throughout the record. And that was the context upon which the deposition was taken, and to Judge Shred's earlier questions with respect to it being widely known, these areó It's actually Judge Shed. Not Judge Shred. You can'tóhe's Shred, I'm Shed. I think that's right. My pardon. No, that's fine. But these prices are not widely known. I mean, these are specific bids that we're competing for against other companies. And the $11.20 was for a small scope of work in the context of that deposition. That's fine. But you haven't come up with anything that explains $142 or $148, whichever. Yeah. Is that a yes? Yeah. Is that a yes? That's a yes. Thank you. If I may just expound on that, Your Honor. Absolutely. So the $148 is Merkle's price. That's when Mr. May went in and questioned whether or not that $148 was high. But it doesn't matter. My question is, what is there? And unless you've given us something, all we have is $11.27 and this $142 that even Judge Brinkema was baffled by. And it also begs the question how that $148 got to $140.5. Well, it's a question that you have to answer if you're going to show that there was information communicated that allowed Merkle to compete unfairly against you on the basis of it. I don't have direct evidence of that, and that's why we're asking the court. No, no. What I'm asking you for is direct evidence of information only you would have. Yeah. We don't have that information, what Merkle said to each other in those meetings. No. Only you have information of the price that Merkle would have to shoot for or at. So Mr. May was employed by Merkle at the time that the price reduction was made. I do understand that. I do understand that. There must have been some other person other than Mr. May who knew what the price was going to be when they were bidding on that. It's your client, yes. Yeah. I mean, Chad Slater's affidavit is the only direct evidence we have of a $142 price. And he calculated that through what he said would be mathematics, taking the total cost of how he submits his bids divided by the number of leads that was in the statement of works. So you do have somebody that supports the $142? That's right, Mr. Slater. But didn't. He set forth in his affidavit, Your Honor. That's the only direct evidence we have. He said he didn't. The district court noted that, too. Yeah, the district court rejected that. I don't think we have any further questions. Thank you very much.
judges: Diana Gribbon Motz, Dennis W. Shedd, Allyson K. Duncan